1
2
3
4
5
6
7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10  ANSAR MUHAMMAD a/k/a
    NICOLAS RAMONE EDWARDS,
11
                Petitioner,          2: 04 - cv - 1127 - TJB
12
        vs.
13
    D.L. RUNNELS, et al.,
14
                Respondents.         <u>ORDER</u>
15
    _____/
16

17                      I.  INTRODUCTION

18          Petitioner is a state prisoner proceeding *pro se* with an application for writ of habeas

19  corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), Petitioner consented in

20  June 2004 to have a United States Magistrate Judge conduct all further proceedings in this case.

21  Respondents consented on December 9, 2009.

22          Following a 2001 jury trial where Petitioner represented himself pro per, Petitioner was

23  convicted of two counts of second degree robbery, attempted murder, assault with a firearm on a

24  police officer and being a felon in possession of a firearm along with several enhancements under

25  these charges.  The jury also found true that the Petitioner was previously convicted of battery

26  with serious bodily injury in 1992.  Petitioner was sentenced to fifty years and four months

                                       1

1   imprisonment.

2       Petitioner raises several claims in this federal habeas petition; specifically:  (1) the trial

3   court violated Petitioner's constitutional rights when it required him to wear a stun belt during

4   portions of his trial as well as a belly chain during the trial ("Claim I"); (2) Petitioner's

5   constitutional rights were violated when he was denied access to the prison law library in

6   preparing for trial ("Claim II"); (3) the trial court violated Petitioner's due process rights when it

7   denied Petitioner's request for a live pre-trial lineup ("Claim III"); (4) the trial court erred when it

8   refused to allow Petitioner to impeach a prosecution witness on a prior misdemeanor conviction

9   ("Claim IV"); and (5) several claims involving Petitioner's 1992 prior battery conviction with

10  serious bodily in violation of Cal. Penal Code § 243(d) including:  (a) the prosecution failing to

11  meet their burden of proof that the 1992 conviction satisfied the prior felony element on a

12  conviction for being an ex-felon in possession of a firearm (see Pet'r's Traverse at p. 47.), (b) the

13  1992 prior conviction constituting a strike as a serious prior felony under California Three

14  Strikes Law (see id.); (c) the trial court failing to conduct a jury trial that Petitioner had a prior

15  conviction and that the 1992 conviction constituted a prior serious felony under California's

16  Three Strikes Law (see id. at p. 49.); and (d) the use of the 1992 battery conviction as a strike

17  violated the 1992 plea agreement (collectively "Claim V").[1]  For the foregoing reasons, the

18  petition is denied.

19                              II.  FACTUAL BACKGROUND[2]

20              Kishor Patel and Jagit Bhandal were working behind the counter at
                Day's Market about 1:15 p.m. on July 1, 1998.  A man entered the
21              store wearing a mask.  He walked behind the counter, pointed a
                black gun at Patel and Bhandal, and demanded money from the
22              cash register.  Bhandal put paper bills totaling approximately $400

23

24      [1] In his Traverse, Petitioner reiterated that he "has never waivered concentrating his
    argument(s)" on these issues with respect to Claim V.  (Pet'r's Traverse at p. 47.)

25      [2]  The factual background is taken from the California Court of Appeal, Third Appellate
    District opinion dated May 19, 2003.  Respondents filed this opinion in this Court on March 22,
26  2010 as lodged document number 4 (hereinafter "Slip Op.").

in a blue bag the robber took from his pocket.  The robber told
Patel and Bhandal to go to a back room, then fled on a blue bike.
Patel called 911 and gave the operator a description of the robber.
Meanwhile, Sacramento Police Officer Charles Husted was on
patrol in the Oak Park area in a K-9 unit.  He received a radio
dispatch about the robbery that described the suspect as a Black
adult male, armed with a firearm, wearing a white t-shirt and black
shorts, and riding a blue bicycle.  Because the suspect had already
left the robbery scene, Husted decided to look for him in the
surrounding neighborhood.  He saw defendant, a black male, on a
blue bike near the corner of 16th Avenue and Temple.  Husted was
not "100 percent convinced" that defendant was the robbery
suspect, because he was wearing a white multi-colored t-shirt and
light-colored pants.  As Husted approached, defendant got on his
bike and started to ride away.  At that point, Officer Husted
grabbed defendant by the armah  to stop him from leaving.
Defendant resisted and drew a gun from his pocket as Husted was
calling for backup.  A struggle ensued but Officer Husted was
unable to take defendant's gun.  Defendant aimed and fired at
Husted from close range and the officer shot back.  Defendant's
second shot hit Husted in the shoulder as he was retreating to
safety behind his patrol car.  As defendant continued to fire, Husted
released his dog and the dog subdued the defendant.

Officer Joseph Kuzmich took Patel to the place defendant had been
detained.  Paramedics had started cutting off defendant's pants,
revealing a blue zipped bag filled with money, and the same
clothes the robber had worn.  Recognizing the man's eyes,
forehead and dress, Patel identified defendant as the robber.  He
stated the gun carried by defendant was similar to the one used in
the robbery.  Patel also identified the blue bag.  The bag contained
$333 in cash and two $5 food stamps.

(Slip Op. at p. 3-4.)

### III.  PROCEDURAL HISTORY

A jury trial convened in 2001 and Petitioner was convicted on two counts of second

degree robbery, one count of attempted murder, assault with a firearm of a police officer and

being a felon in possession of a firearm.  Petitioner appealed his convictions to the California

Court of Appeal, Third Appellate District.  That Court denied Petitioner's direct appeal in a

written opinion on May 19, 2003.  On July 30, 2003, the California Supreme Court summarily

denied the petition for review.

Petitioner first filed a federal habeas petition in 2004.  Subsequently several amended

1  habeas petitions were dismissed/stayed so that Petitioner could fully exhaust his claims in state

2  court.  In April 2005, the California Supreme Court summarily denied Petitioner's state habeas

3  petition.  Between 2004 and 2009, Petitioner filed several state habeas petitions all of which were

4  denied.  Petitioner filed his fourth federal amended habeas petition in June 2009.  The

5  Respondents answered Petitioner's fourth amended federal habeas petition on March 9, 2010.

6  With respect to Claim V, Respondents alleged that it was not exhausted.  (See Resp'ts' Answer

7  at p. 12.)  Respondents also argued that Petitioner was not entitled to federal habeas relief on all

8  of his claims on their merits.

9                          IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

10         An application for writ of habeas corpus by a person in custody under judgment of a state

11  court can only be granted for violations of the Constitution or laws of the United States.  See 28

12  U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

13  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

14  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

15  and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

16  320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

17  decided on the merits in the state court proceedings unless the state court's adjudication of the

18  claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

19  clearly established federal law, as determined by the Supreme Court of the United States; or (2)

20  resulted in a decision that was based on an unreasonable determination of the facts in light of the

21  evidence presented in state court.  See 28 U.S.C. 2254(d).

22         As a threshold matter, this Court must "first decide what constitutes 'clearly established

23  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrande,

24  538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

25  under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

26  at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

4

1    application clause, a federal habeas court making the unreasonable application inquiry should ask

2    whether the state court's application of clearly established federal law was "objectively

3    unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

4    not issue the writ simply because the court concludes in its independent judgment that the

5    relevant state court decision applied clearly established federal law erroneously or incorrectly.

6    Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court

7    law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

8    determining whether a state court decision is an objectively unreasonable application of clearly

9    established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While only

10   the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

11   applied, we may look for guidance to circuit precedents.").

12          The first step in applying AEDPA's standards is to "identify the state court decision that

13   is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

14   When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

15   last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  The

16   California Court of Appeal analyzed Claims I-IV on the merits in its decision on direct appeal.[3]

17          With respect to Claim V, Respondent argues that it is unexhausted as Petitioner never

18   raised this Claim to the California Supreme Court.  A petitioner satisfies the exhaustion

19   requirement by providing the highest state court with a full and fair opportunity to consider each

20   claim before presenting it to the federal court.  See Baldwin v. Reese, 541 U.S. 27, 29 (2004);

21   Fields v. Waddington, 401 F.3d 1018, 1020 (9th Cir. 2005).  Petitioner never raised Claim V to

22   the California Supreme Court so it is deemed unexhausted.  Nevertheless, unexhausted claims

23   may "be denied on the merits, notwithstanding the failure of the applicant to exhaust the

24   remedies in the courts of the State."  28 U.S.C. § 2254(b)(2).  A federal court considering a

25   ───────────────

26          [3] As discussed in infra Part V.A, Claim I was only exhausted with respect to the stun belt
     issue.

5

1  habeas corpus petition may deny an unexhausted claim on the merits when it is perfectly clear

2  that the claim is not "colorable."  See Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005).

3                              V. PETITIONER'S CLAIMS FOR REVIEW

4       A.  Claim I

5       In Claim I, Petitioner alleges that his due process, fair trial, presumption of innocence and

6  counsel rights were violated when the trial court required Petitioner to wear an electric stun

7  device during trial.  The California Court of Appeal analyzed this Claim in its opinion on direct

8  appeal and stated the following:

9           The court granted a sheriff's department request for security
            measures to include the use of a belly chain while defendant was
10          seated and the use of a "REACT" belt while defendant was
            standing to present opening and closing argument to the jury.
11          [FN2] Based on defendant's prior violent and insubordinate
            conduct and "most notably, assaultive conduct on a peace officer,"
12          it found "a demonstrative need for additional security precautions
            above and beyond those typically used . . . ."

13
            [FN2]  "REACT" stands for "Remote Electronically Activated
14          Control Technology."  (People v. Mar (2002) 28 Cal.4th 1201,
            1214 (Mar).)  The belt is described as follows:  "'Stun belts are
15          used to guard against escape and to ensure courtroom safety. . . .
            The type of stun belt which is used while a prisoner is in the
16          courtroom consists of a four-inch-wide elastic band, which is worn
            underneath the prisoner's clothing.  This band wraps around the
17          prisoner's waist and is secured by a Velcro fastener.  The belt is
            powered by two 9-volt batteries connected to prongs which are
18          attached to the wearer over the left kidney region. . . .
            [Citations.]  [¶]  The stun belt will deliver an eight-second, 50,000-
19          volt electric shock if activated by a remote transmitter which is
            controlled by an attending officer.  The shock contains enough
20          amperage to immobilize a person temporarily and cause muscular
            weakness for approximately 30 to 45 minutes.  The wearer is
21          generally knocked to the ground by the shock and shakes
            uncontrollably.  Activation may also cause immediate and
22          uncontrolled defecation and urination, and the belt's metal prongs
            may leave welts on the wearer's skin requiring as long as six
23          months to heal.  An electrical jolt of this magnitude causes
            temporary debilitating pain and may cause some wearers to suffer
24          heartbeat irregularities or seizures. [Citations.]'" (Id. at pp. 1214-
            1215.)
25
            Defendant did not challenge the belly chain at trial and does not
26          attempt to do so here.  Instead, he argues the court abused its

                                        6

discretion in ordering use of the REACT belt based on a showing he had engaged in violent behavior *outside* the courtroom. Defendant says its use – involving the threat of a severe shock – hampered his ability to represent himself in propria persona at trial and violated his constitutional rights to due process, counsel, and a fair trial. We conclude the record supports the court's ruling and there was no abuse of discretion.

"[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (People v. Duran (1976) 16 Cal.3d 282, 290-291 (Duran); see also Mar, supra, 28 Cal.4th at p. 1205 ("general principles set forth in Duran that apply to the use of traditional types fo physical restraints also apply to the use of a stun belt"].) A record of violence does not alone justify restraints. (People v. Cunningham (2001) 25 Cal.4th 926, 986.) Instead, the record must demonstrate violence or a threat of violence or other nonconforming conduct. (Duran, supra, 16 Cal.3d at p. 291.) Nonconforming conduct may include "a showing that he plans . . . to disrupt proceedings by nonviolent means. Evidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained may warrant the imposition of reasonable restraints if, in the sound discretion of the court, such restraints are necessary." (Id. at pp. 292-293, fn. 11.) Manifest need is demonstrated in a variety of circumstances (id. At p. 291), and we will affirm the trial court's ruling absent abuse of discretion (People v. Medina (1995) 11 Cal.4th 694, 731).

Defendant maintains he never "became violent, abusive, or threatening" in the trial court proceedings and notes that on one occasion he himself asked to be removed to a holding cell when he became upset about a court ruling. The record generally supports defendant's characterization of his behavior in court up to the time of the sentencing hearing. However, defendant's actual conduct at trial is irrelevant to the question whether the pretrial record supports a finding of "manifest need" for the REACT belt during opening and closing argument.

Sheriff's Deputy William Imhof, the trial bailiff, represented that defendant had "a local history of convictions for batteries with great bodily injury, resisting arrest and obstructing justice . . . ." While in custody for the offenses at issue in this appeal, he had 11 jail write-ups. The most recent, in February 2001, involved an assault on another inmate while both were wearing belly chains. Imhof said that "when officers were wanting to break it up and separate them, [defendant] still continued to try to fight and was kicking the other inmate, so he didn't just stop." One write-up was for an assault on an officer at the jail "in which [defendant] beat him enough where they had to transport him to the hospital." Another write-up involved inciting a riot. Deputy Imhof stated that

7

defendant was a member of a prison gang known for its violence and resistence to authority.  We conclude this evidence supports the court's determination there was a danger that defendant's nonconforming conduct would disrupt the trial proceedings if unrestrained.  (<u>Duran</u>, <u>supra</u>, 16 Cal.3d at p. 292, fn. 11.)

In any event, defendant was not prejudiced by the use of the REACT belt during his opening and closing argument.  "The guidelines imposed by <u>People v. Duran</u>, <u>supra</u>, 16 Cal.3d at page 290, are intended, in large part, to avoid prejudice in the minds of jurors where a defendant appears or testifies in obvious restraints, or where the restraints deter him from taking the stand in his own behalf."  (<u>People v. Tuilaepa</u> (1992) 4 Cal.4th 569, 583.)  There is ordinarily no prejudice where the jury has only brief glimpses of the defendant in shackles inside or outside of the courtroom.  (<u>Duran</u>, <u>supra</u>, 16 Cal.3d at p. 287, fn.2.)  Here, we find nothing in the record to show that the jurors were aware defendant was wearing a REACT belt while addressing them from the podium.  The REACT belt was not activated during defendant's statements to the jury.

At the hearing on the sheriff's department request for restraints, defendant complained about a different kind of prejudice:  "[H]aving something like [the REACT belt] attached to my person while I am under a very serious point in my life, fighting for my life, and he places a belt that will deliver shock, that will be on my mind the whole time I am here.  [¶]  I don't see how I will focus on the case to deliver myself a fair trial or presentation in trial while I am siting here worrying about this belt or if this officer believes that I am beginning to get hostile or something.  [¶]  At certain times in my delivery of opening statements or closing arguments, I may raise my voice.  This officer might give me a shock.  I am going to be worried about that, and it will affect my presentation and how I present my case."  Citing <u>Mar</u>, <u>supra</u>, 28 Cal.4th at page 1225, footnote 7, defendant emphasizes on appeal that in "the improper use of a stun belt, . . . the greatest danger of prejudice arises from the potential psychological effect of the device upon the defendant rather than from the visibility of the device to the jury."  We conclude defendant fails to show that he was, in fact, prejudiced by being required to wear the REACT belt.

In <u>Mar</u>, the court required the defendant to wear the REACT belt during his trial testimony.  (<u>Mar</u>, <u>supra</u>, 28 Cal.4th at pp. 1208, 1213.)  The trial court ruled it was in defendant's best interest "to testify as a reasonable person, without exhibiting any lapses in self-control."  (<u>Id.</u> at p. 1213.)  The Supreme Court held this was insufficient grounds for restraint under <u>Duran</u>, and concluded the trial court abused its discretion in overruling defendant's objection to the REACT belt.  (<u>Id.</u> at p. 1223.)  Turning to the question of prejudice, the Supreme Court noted that it was "impossible to

1   determine with any degree of precision what effect the presence of
2   the [REACT] belt had on the substance of defendant's testimony or
    on his demeanor on the witness stand," but concluded it had "at
    least some effect on his demeanor. . . ." (Id. at p. 1225.) The
3   Supreme Court cited the relative closeness of the evidence, which
    turned completely on the jury's evaluation of defendant's
4   credibility, and the crucial nature of defendant's demeanor while
    testifying and ruled the trial court's error was prejudicial under
5   either the Watson or Chapman standards. (Mar, supra, at p. 1225.)

6   This case differs from Mar in several respects. First, defendant
    wore the REACT belt only during argument and did not testify at
7   trial. Second, apart from defendant's comment at the start of
    opening statement that he was "a little nervous today," there is
8   nothing in his presentations to the jury to suggest he was overly
    anxious or that his nervousness was caused by the REACT belt. In
9   a lengthy closing argument, defendant presented his theories of
    defense using detailed references to trial testimony and a visual
10  presentation of the exhibits. Third, this was not a close case that
    turned on defendant's credibility. There were witnesses to the
11  robbery at Day's Market and the assault on Officer Husted. In
    addition, the blue bag containing $333 in cash plus food stamps
12  was found in defendant's possession.

13  (Slip Op. at p. 4-10.)

14      Respondents argue in their answer that Petitioner "is barred from obtaining relief in light

15  of the absence of clearly established Supreme Court precedent concerning the use of stun belts

16  that are not visible to the jury." (Resp'ts' Answer at p. 18.) A similar argument was made in

17  Gonzalez v. Pliler, 341 F.3d 897 (9th Cir. 2003). In Gonzalez, 341 F.3d at 904, the issue was

18  whether restrictions on the use of stun belts constituted a "new rule" as used in Teague v. Lane,

19  489 U.S. 288 (1989). As the Ninth Circuit explained, under Teague, "a new rule of criminal

20  procedure is retroactive if it 'places certain kinds of primary, private individual conduct beyond

21  the power of criminal law-making authority to proscribe,' or if the rule 'requires the observance

22  of those procedures that . . . are implicit in the concept of ordered liberty.'" Gonzalez, 341 F.3d

23  at 904 (quoting Teague, 489 U.S. at 311). Where "the rule a habeas petitioner seeks to assert can

24  be meaningfully distinguished from that established by binding precedent at the time his state

25  court conviction became final, the rule is a 'new' one, typically inapplicable on collateral

26  review." Id. (internal quotation marks and citations omitted). However, if "the rule cannot be so

1  distinguished, the rule is not of 'new' ilk and is, as a result, applicable in the habeas context." <u>Id.</u>

2  (citing <u>Torres v. Prunty</u>, 223 F.3d 1103, 1110 (9th Cir. 2000); <u>Graham v. Gilbert</u>, 506 U.S. 461

3  469 (1993); <u>Bailey v. Newland</u>, 263 F.3d 1022, 1030 (9th Cir. 2001)).   Ultimately, the Ninth

4  Circuit held that the Supreme Court has long imposed constitutional limits on the use of physical

5  restraints at trial, and determined that Supreme Court precedent was not just confined to a

6  particular type of restraint.   <u>See id.</u>   Otherwise, the Ninth Circuit reasoned:

7          a new rule of criminal procedure would obtain every time there
           was a technological advance in the design of prisoner restraints.
8          The form of the physical restraint, however, is irrelevant to the
           application of the constitutional standards.   It matters not whether
9          the restraint takes the form of handcuffs, gags, leg shackles, ropes,
           straight jackets, stun belts or force fields.   The relevant
10         constitutional questions are identical and dictated by a long line of
           case law.   In short, the applicable rule in this case was dictated by
11         precedent existing at the time [Gonzalez's] conviction became
           final.

12

13  <u>Id.</u> at 904-05 (internal quotation marks and citations omitted).

14         Even though the Ninth Circuit's reasoning in <u>Gonzalez</u> seems to foreclose Respondents'

15  argument that there is no clearly established Supreme Court precedent on the use of non-visible

16  stun belts at trial, Respondents argue that <u>Gonzalez</u> is no longer controlling in light of the

17  Supreme Court decision in <u>Carey v. Musladin</u>, 549 U.S. 70 (2006).   In <u>Musladin</u>, the Supreme

18  Court analyzed whether the state court holding was contrary to or an unreasonable application of

19  clearly established federal as determined by the Supreme Court when it held that a defendant's

20  fair trial rights were not violated when the victim's family wore buttons of the victim at

21  defendant's trial.   <u>See</u> 549 U.S. at 72.   Ultimately, the court differentiated previous cases

22  involving state-sponsored courtroom practices, such as wearing identifiable prison clothing at

23  trial, <u>see</u> <u>Estelle v. Williams</u>, 425 U.S. 501 (1976) as well as the seating of uniformed state

24  troopers immediately behind the defendant at trial, compared to the effect of a defendant's fair

25  trial rights on spectator conduct at trial.   <u>See</u> <u>Musladin</u>, 549 U.S. at 76.   The Supreme Court

26  stated that it:

has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial.  And although the Court articulated a test for inherent prejudice that applies to state conduct in <u>Williams</u> and <u>Flynn</u>, we have never applied that test to spectator's conduct.  Indeed, part of the legal test of <u>Williams</u> and <u>Flynn</u> – asking whether the practices furthered an essential state interest – suggest that those cases apply only to state-sponsored practices.

<u>Id.</u>  Ultimately, the Supreme Court determined that:

[g]iven the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court "unreasonabl[y] appli[ed] clearly established Federal law." § 2254(d)(1).  No holding of this Court required the California Court of Appeal to apply the test of <u>Williams</u> and <u>Flynn</u> to the spectators' conduct here.  Therefore, the state court's decision was not contrary to or an unreasonable application of clearly established federal law.

<u>Id.</u> at 77.

As previously stated, Respondents assert that <u>Musladin</u> narrowed what is to be considered "clearly established Federal law."  However, the Supreme Court in that case was clear to delineate the difference between state-sponsored courtroom practices and spectator courtroom conduct.  Here, the Ninth Circuit in <u>Gonzalez</u> laid out the Supreme Court precedent regarding the use of physical restraints and applied this "clearly established" law to the use of a stun belt.  Furthermore, the Ninth Circuit determined that the applicable rule was not barred by <u>Teague</u>, and was dictated by existing precedent.  <u>See Gonzalez</u>, 341 F.3d at 904-05.  Respondents' arguments notwithstanding, for the reasons outlined in <u>Gonzalez</u>, Petitioner's stun belt claim rises to the level of an issue asserting that the state court's decision was contrary to or an unreasonable application of clearly established federal law.  <u>See, e.g.</u>, <u>Hill v. Campbell</u>, Civ. No. 05-4514, 2010 WL 4696636, at *5 (N.D. Cal. Nov. 10, 2010).  Thus, the merits of this Claim will be analyzed.

Petitioner asserts that wearing the stun belt during the opening and closing arguments hampered his ability to represent himself at trial due the profound psychological effects of

wearing the belt.  Stun belts are an alternative method of prisoner restraint to shackles.  See

Gonzalez, 341 F.3d at 899.  "As with all forms of physical confinement during trial, the use of

stun belts raises a number of constitutional concerns."  Id.  For example, the sight of physical

restraints might have a significant effect on the jury and could impede a defendant's ability to

communicate with his counsel and participate in his defense.  See id. at 899-900.  Furthermore,

the use of physical restraints might also confuse and embarrass a defendant which would impair

his mental faculties.  See id. at 900. (citations omitted).  As noted by the Ninth Circuit:  "'[i]n all

[ ] cases in which shackling has been approved,' we have noted, there has been 'evidence of

disruptive *courtroom* behavior, attempts to escape from custody, assaults or attempted assaults

while in custody, or a *pattern* of defiant behavior toward corrections officials and judicial

authorities.'"  Id. (quoting Duckett v. Godinez, 67 F.3d 734, 749 (9th Cir. 2003).

      In Gonzalez, the Ninth Circuit stated the following with respect to stun belts:

> The use of stun belts, depending somewhat on their method of
> deployment, raises all of the traditional concerns about the
> imposition of physical restraints.  The use of stun belts, moreover,
> risks "disrupt[ing] a different set of a defendant's constitutionally
> guaranteed rights."  United States v. Durham, 287 F.3d 1297, 1305
> (11th Cir. 2002).  Given "the nature of the device and its effect
> upon the wearer when activated, requiring an unwilling defendant
> to wear a stun belt during trial may have significant psychological
> consequences."  Mar, 124 Cal.Rptr.2d 161, 52 P.3d at 97.  These
> "psychological consequences," id., cannot be understated.  Stun
> belts, for example, may "pose[ ] a far more substantial risk of
> interfering with a defendant's Sixth Amendment right to confer
> with counsel than do leg shackles."  Durham, 287 F.3d at 1305.
> We have long noted that "one of defendant's primary advantages of
> being present at trial[ ] [is] his ability to communicate with his
> counsel."  Spain [v. Rushen], 883 F.2d [712], 820 [(9th Cir.
> 1995)]; see also Kennedy v. Cardwell, 487 F.2d 101, 106 (6th Cir.
> 1973) (asserting that restraints confuse mental faculties and thus
> abridge a defendant's constitutional rights).  Stun belts may
> directly derogate this "primary advantage[ ]," Spain, 883 F.2d at
> 720, impacting a defendant's right to be present at trial and to
> participate in his or her defense.  As the Eleventh Circuit . . .
> observed, "[w]earing a stun belt is a considerable impediment to a
> defendant's ability to follow the proceedings and take an active
> interest in the presentation of his case."  Durham, 287 F.3d at
> 1306.  "The fear of receiving a painful and humiliating shock for
> any gesture that could be perceived as threatening likely" hinders a

1  defendant's participation in defense of the case, "chill[ing] [that]
   defendant's inclination to make any movements during trial -
2  including those movements necessary for effective communication
   with counsel." Id. at 1305
3

4  341 F.3d at 900.  A decision to use a stun belt at trial is subjected to the same close judicial

5  scrutiny required for imposing other physical restraints.  See id. at 901.  Before a court orders the

6  use of a physical restraint on the defendant at trial, "'the court must be persuaded by compelling

7  circumstances that some measure [is] needed to maintain the security fo the courtroom," and, as

8  noted, "the court must pursue less restrictive alternatives before imposing physical restraints.'"

9  Id. (quoting Morgan v. Bunnel, 24 F.3d 49, 51 (9th Cir. 1994)).

10      Before trial, the trial judge heard arguments from the bailiff and the Petitioner on the

11  request to use a stun belt:

12      THE BAILIFF:  Judge, Mr. Muhammad, also known as Nicholas
        Edwards, just in addition to the charges in this case, 211 and
13      attempted murder on a Sac PD officer, he has a local history of
        convictions for batteries with great bodily injury, resisting arrest
14      and obstructing justice, quite a few arrests and convictions for that.
        And in this custody period, which has extended from, I think, July
15      of 1998, he has 11 jail write-ups; and those are violations of jail
        rules, so what happens is, you get written up and administrative
16      action is taken.
        The latest one was on February 9th of this year, which was an
17      assault on another inmate; and basically the gist of that write-up
        was, while Mr. Edwards and another inmate were both in belly
18      chains, they got into a fight.
        And when officers were wanting to break it up and separate them,
19      inmate Edwards still continued to try to fight and was kicking the
        other inmate, so he didn't just stop.  It was a continuous thing.
20      Of those 11 write-ups, six were for insubordinate behavior.  That is
        the kind of behavior – whether to fail to lock down when the
21      officer orders him to lock down, comply with nurses, come in from
        recreation or quit visits, disruptive behavior, stuff like that, that
22      tends to totally disrupt the jail functions.
        I think – not in this custody period that I can recall but in his
23      previous custody period, he had a number of the same type of
        write-ups, same type of behavior problems.  In fact, one was for an
24      assault on an officer in the jail in which he beat him enough where
        they had to transport him to the hospital.
25      Another one was for inciting a riot.  I don't recall the specifics of
        that, other than he was encouraging other inmates to act out like he
26      was, to disrupt whatever activity was going on.  I don't know if it

13

1   was lunch or feed or what.
    Let's see.  He also is a member of a prison gang, Anasar El
2   Muhammad.  What happens, members take on that name, the aka.
    That gang is known for their violence and their resistence to
3   authority . . . .
    And it's well-known throughout the jails and prisons that that's the
4   type of behavior exhibited by these gangs and encouraged by their
    members.
5   So we would request that he remain – some kind of security
    measures remain for the safety and security of the courtroom.
6   Many times we are short-handed so we can't necessarily have two
    escort officers.  Sometimes it is hard enough just to get one.
7   So measure that I would request would be like for proceedings like
    today, days that we are just doing testimony or motions, that he
8   remain chained to the chair, both hands free, shackles off but still
    remain chained to the chair.
9   Maybe it will encourage him to maintain his composure and if
    something was to happen, then whatever escort officer and myself,
10  if I am the bailiff, you know, it will give us time to react.
    If he does opening statements and you decide to let him stand at the
11  podium or closing arguments, something of those natures, I think
    the options would be . . . the react belt . . . . It is the same type of
12  react belt we used to have.  We could have that.  It fits under the
    type clothes on the legs so it is not visible, intrusive of his looking
13  like an out-of custody person at the time.
    And probably having two deputies escort, one in the back so he is
14  not readily – you know, eyes look beyond the jury and myself also.
    I could be in the well.
15  Just those precautions to take to prevent anything from happening
    or to encourage composure in the court.
16  THE COURT:  All right, Deputy Imhof is the regularly assigned
    bailiff for this court, and you secured that information in view of
17  the Court's records?
    THE BAILIFF:  The jail computer system for all the write-ups,
18  local criminal history.
    THE DEFENDANT:  I would just like to say the write-ups that he
19  is referring to, where are they?  Write-ups that you are referring to,
    do you have them?
20  THE BAILIFF:  Yeah, I have copies and they are on the computer.
    There is always a permanent record.
21  THE COURT:  It is my understanding that the deputies at the time
    of any incident make a record that is maintained by the Sheriff's
22  Department.  Is that correct?
    THE BAILIFF:  Yes, as a matter of fact, a copy is given to the
23  inmate when they have their administrative hearing; and they sign
    it and it is kept in their permanent jail file.
24  If they refuse to sign it, they put it in the permanent jail file so there
    is a permanent copy on file.
25  THE DEFENDANT:  Deputy, have you ever had any problems
    with me in the past?
26  THE BAILIFF:  No, I never met you.

14

1   THE DEFENDANT:  Have you seen any indication I would be
    wild or outbursts here in the courtroom?

2   THE BAILIFF:  Personally seen in so far you have been pretty well
    composed.  I saw you get heated with the D.A. a little while ago

3   but that was a mutual type.
    THE DEFENDANT:  I stayed in my seat.

4   THE BAILIFF:  You stayed seated.
    THE DEFENDANT:  Didn't use any profanity?

5   THE BAILIFF:  Did not at all.
    THE DEFENDANT:  You made reference to some kind of a belt

6   or something.
    THE BAILIFF:  It is called a react belt.

7   THE DEFENDANT:  As you say it would deliver some shock to
    me?

8   THE BAILIFF:  Correct.
    THE DEFENDANT:  If you felt I was doing something that was a

9   threat?  If you felt I was a threat in the courtroom or endangering
    anybody or something like that, then I would receive some kind of

10  shock?
    THE BAILIFF:  The deputy that is trained to operate that and is

11  proficient that would be escorting, yeah, they would.   It gives you
    a warning to let you know that –

12  THE DEFENDANT:  You haven't seen any behavior from me
    exhibiting that type of behavior that would warrant that type of

13  precaution on me?
    THE BAILIFF:  In the last two hours, no.

14  THE DEFENDANT:  Any time you have been in this jail?
    THE BAILIFF:  I have never seen you before.

15  THE DEFENDANT:  You are just going off of write-ups?
    THE BAILIFF:  Correct.

16  THE DEFENDANT:  How do you feel that I would warrant this
    kind of shock worn on my person in a trial?  If you are going to put

17  that belt on me, you might as well leave it for the jury to see.
    THE COURT:  Don't argue with him.  If you have any request for

18  information or you think he needs to provide more information to
    the Court, you can certainly make your statement to me as to why

19  you should or should not have that type of measure imposed or
    what alternative measure I could consider if I felt measures were

20  necessary.
    THE DEFENDANT:  I don't have any problems with basically

21  anything he is saying.  I was trying to get a feel if he felt I was a
    threat at any time dealing with me.

22  THE COURT:  What he is saying, there are officers that are trained
    specifically.  Not every officer is trained in the operation of the

23  react belt.  They received some training regarding its use and
    included in that training, as I understand, is essentially a warning

24  signal, an indication to you if your behavior – you are not
    complying.

25  THE DEFENDANT:  I am shocked.
    THE COURT:  Right.  There is an initial signal, basically, that lets

26  you know you need to rein yourself in or else you will receive a

15

shock.

THE DEFENDANT:  Okay.

THE COURT:  But you can avoid it entirely if. [sic]  No. 1, you are complying and, No. 2, you heed any warning issues.  I think what he is suggesting, that simply be used on the days when there is some necessity for you to move about.

Several of the days we are talking about it would be typically off.  Counsel will remain seated for the most part as well, and that is during the questioning of the witnesses from counsel table where you are understandably relying on your notes or notebook and just questioning witnesses.

But is common and the Court is concerned about you having an ability to address and stand up as any attorney would in the well, behind a podium and address the jury directly during opening statements if you choose to make them, and, of course, during closing arguments, should that also be something that you wish to make.

THE DEFENDANT:  Actually, what I am trying to get at is that having something like that attached to my person while I am under a very serious point in my life, fighting for my life, and he places a belt that will deliver shock, that will be on my mind the whole time I am here.

I don't see how I will focus on the case to deliver myself a fair trial or presentation in trial while I am sitting here worrying about this belt or if this officer believes that I am beginning to get hostile or something.

At certain times in my delivery of opening statements or closing arguments, I may raise my voice.  This officer might give me a shock.  I am going to be worried about that, and it will affect my presentation and how I present my case.  If he –

THE COURT: You don't have any objection to the belly chain while you are seated at the table?  You just object to the belt –

THE DEFENDANT:  And I don't have any objection – I don't know what the name is, reaction belt or whatever it is, if I exhibited that kind of behavior, it would warrant it; but at this point in time, I haven't exhibited that.

I understand if I do exhibit that behavior, I have it coming but at the present time, I haven't.  If you assume ahead of time that I need that belt, I will be worried about it right here in trial.

That all will be on my mind, is that this dude is going to give me a shock.  He doesn't know me.  He doesn't know anything personally about me.  He can jump the gun or anything.  If I get a shock in front of the jury, what is that going to do to my jury?

THE COURT:  Deputy Imhof?

THE BAILIFF:  When the officer does the react, he explains to you exactly how it works.  You have an instruction sheet that he will go over with you.

The particular officer that runs it is Deputy Skip Huber, who has been around for many years.  He is not a jump-the-gun type officer.  He is laid-back, low-keyed.  I don't think he has ever had to use it after they have explained what would happen.

It's – it would just be a precaution because of the history that Mr. Edwards has exhibited over the last – since 1984 is when I researched to.  We need that kind of precaution.

THE DEFENDANT:  1984?  I was 14 years old.  I wasn't even in the county jail.

THE BAILIFF: I think that is when it goes back to YA.

THE COURT:  Let me indicate that the Court does view, based on the presentation of Deputy Imhof and the research of his background, although he admits his personal contact is brief, he relayed information that he received from the jail's records, including your current course of incarceration and previous course.  I am aware of the alleged facts in this case; and, apparently, there has been assaultive conduct and certainly insubordinate conduct but most notably, assaultive conduct on a peace officer.

In the Court's view, that does raise concern about the ability to maintain a peaceful courtroom environment.  We have legitimate concerns, Mr. Muhammad, I understand, regarding the react belt.  The Court has legitimate concerns.

I feel an obligation to the individuals that work and will be in the courtroom throughout this case.  It is my hope that nothing will happen.  I have no way of predicting the future.  Past behavior sometimes is the best indication of what one can expect for fear.

I do find that there's been a demonstrative need for additional security precautions above and beyond those typically used, utilized by the Court, among and including those of assaultive conduct and the nature of the charge and a serious assault on a peace officer in the jail during your previous incarceration.

I believe that the recommendation and request for a chain to the belly, you have no objection to that.  That can be done in an unobtrusive fashion.  That will be ordered.

In terms of your presentations and opening and closing, if you wish to have movement and be able to stand in front of the jury, I will grant the request for the react belt; but I will request that the deputy present that information to you as indicated by the deputy, outlining the use and manner in which such belt would be used.  Alternatively, I would consider, if you wish to make your statement from the table – I don't know if there is an alternative security measure we can have to have him stand at the table without the react belt if you felt that that was an option you would prefer Mr. Muhammad.

The react belt, I have seen it.  I have seen it used in court.  I talked to other judicial officers.  I never heard of anyone actually having to send the shock signal, but it can be one that the Court does not see and restrict your movement, not detected by the jury when they are looking at you.

It has been fairly successful at maintaining a peaceful demeanor on behalf of those who wear it.  Unless you have an alternative in terms of what we can do in terms of security measures when you have movement in the court, I will grant the request for the react belt.  That is granted.

1   (Reporter's Tr. at p. 137-47.)

2        As illustrated above, the trial court conducted a hearing where it heard arguments from

3   the bailiff and Petitioner regarding the purported use of the stun belt.  After hearing these

4   arguments and considering the evidence, the trial court independently determined that there was a

5   demonstrative need for additional security precautions in light Petitioner's assaultive conduct

6   while incarcerated.  In <u>Gonzalez</u>, 341 F.3d at 902, the Ninth Circuit quoted <u>Mar</u>, 28 Cal.4th at

7   1221 124 Cal. Rptr. 2d 161, 52 P.3d 95 which stated that:

8               [W]hen the imposition of restraints is to be based upon conduct of
                the defendant that occurred outside the presence of the court,
9               sufficient evidence of that conduct must be presented on the record
                so that the court may make its own determination of the nature and
10              seriousness of the conduct and whether there is a manifest need for
                such restraints; the court may not simply rely upon the judgment of
11              law enforcement or court security officers or the unsubstantiated
                comments of others.
12

13   Here, the trial court was presented with evidence of Petitioner's conduct outside the presence of

14   the court to allow the trial court to make its determination of the nature and the seriousness of the

15   conduct.  The trial court did not simply rely on the judgment of the bailiff in determining that

16   there was a manifest need for Petitioner to wear a stun belt during opening and closing arguments

17   as other incidents were recited by the bailiff before the trial judge made her decision.[4]

18        Additionally, the court considered less restrictive alternatives to using the stun belt.  <u>See</u>

19   <u>Gonzalez</u>, 341 F.3d at 901 (stating that "the court must pursue less restrictive alternatives").  For

20   example, the trial judge stated that she would consider an alternative to the stun belt if Petitioner

21   _____

22        [4]  In <u>Gonzalez</u>, the Ninth Circuit explained that the psychological consequences of
     wearing a stun belt include the interference with counsel as well as impairing a defendant's
23   ability to follow the proceedings.  <u>See</u> 341 F.3d at 900.  In this case, the stun belt was only
     applied during opening and closing statements.  (<u>See</u> Slip Op. at p. 9 ("defendant wore the
24   REACT belt only during argument and did not testify at trial).); <u>cf.</u> 28 U.S.C. § 2254(e)(1) ("[A]
     determination of a factual issue made by a State court shall be presumed to be correct.  The
25   applicant shall have the burden of rebutting the presumption of correctness by clear and
     convincing evidence.").  Petitioner's ability to follow the proceedings during testimony would
26   not have been hampered by the psychological effects of the stun belt as it was not applicable
     during live testimony.

1    would agree to stand at his table.  (See Reporter's Tr. at p. 146-47.)  Thus, Petitioner is not

2    entitled to federal habeas relief that the use of the stun belt violated his constitutional rights.

3        Within Claim I, Petitioner also argues that the use of the belly chain at trial violated his

4    constitutional rights.  (See Pet'r's Fourth Am. Pet. at p. 9-10 and Pet'r's Traverse at p. 2.)

5    Petitioner did not raise this claim to the California Supreme Court.[5]

6        A petitioner who is in state custody and wishes to collaterally challenge his conviction by

7    a petition for writ of habeas corpus must exhaust state judicial remedies.  See 28 U.S.C. §

8    2254(b)(1).  The exhaustion doctrine is based on comity to the state court and gives the state

9    court the initial opportunity to correct the state's alleged constitutional deprivations.

10   See Coleman v. Thompson, 501 U.S. 722, 731 (1991).  A petitioner can satisfy the exhaustion

11   requirement by providing the highest state court with a full and fair opportunity to consider each

12   claim before presenting it to the federal court.  See Duncan v. Henry, 513 U.S. 364, 365 (1995)

13   (per curiam); Picard v. Connor, 404 U.S. 270, 276 (1971).  A federal court will find that the

14   highest state court was given a full and fair opportunity to hear a claim if the petitioner has

15   presented the highest state court with the claim's factual and legal basis.  See Duncan, 513 U.S.

16   at 365.  Nevertheless, a federal court has the power to deny an unexhausted habeas claim on the

17   merits.  See 28 U.S.C. 2254(b).  The Ninth Circuit has explained that a federal court considering

18   a habeas corpus petition may deny an unexhausted claim on the merits when it is perfectly clear

19   that the claim is not "colorable."  See Cassett, 406 F.3d at 624.

20       Visible shackling of a criminal defendant during trial "undermines the presumption of

21   innocence and the related fairness of the factfinding process" and "'affront[s]' the 'dignity and

22

---

23   [5] In Petitioner's counseled petition for review to the California Supreme Court, he argued
     that: "[t]he trial court deprived petitioner of his Fourteenth Amendment due process rights to a

24   fair trial and to the presumption of innocence, and to his Sixth Amendment right to counsel,
     when it ordered he be restrained throughout trial by an electric stun device (a "REACT belt"),

25   without a showing of 'manifest need' for any restraints; as the use of this device psychologically
     hampered petitioner's ability to conduct his 'pro per' defense at trial, his convictions must be

26   reversed."  (Resp'ts' Lodged Doc. 5 at p. 5.)

decorum of judicial proceedings that the judge is seeking to uphold.'" <u>Deck v. Missouri</u>, 544 U.S. 622, 630-31 (2005) (quoting <u>Illinois v. Allen</u>, 397 U.S. 337, 344 (1970)); <u>see also</u> <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1062 (9th Cir. 2008).  The United States Supreme Court has held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." <u>Deck</u>, 544 U.S. at 629.  To protect this right, criminal defendants have "the right to be free of shackles and handcuffs in the presence of the jury, unless the shackling is justified by an essential state interest." <u>Ghent v. Woodford</u>, 279 F.3d 1121, 1132 (9th Cir. 2002).

Shackling is not unconstitutionally prejudicial per se.  See <u>Allen</u>, 397 U.S. at 343-44; <u>Duckett v. Godinez</u>, 67 F.3d 734, 748 (9th Cir. 1995) ("shackling is inherently prejudicial, but is not per se unconstitutional").  For a petitioner to prevail on the merits of a constitutional claim for shackling, the "court must find that the petitioner was physically restrained in the presence of the jury, that the shackling was seen by the jury and that the physical restraint was not justified by state interests." <u>Ghent</u>, 279 F.3d at 1132.  Even if these circumstances are present, unjustified shackling does not rise to the level of constitutional error unless the defendant makes a showing that he suffered prejudice as a result.  See <u>id.</u> (citing <u>United States v. Olano</u>, 62 F.3d 1180, 1190 (9th Cir. 1995); <u>United States v. Halliburton</u>, 870 F.2d 561-62)); <u>see also</u> <u>Larson</u>, 515 F.3d at 1064 (holding that requiring petitioner to wear security leg brace during trial was harmless).  In a federal habeas case, if the petitioner establishes prejudice, the court must determine whether the error had a "substantial and injurious effect" on the jury's verdict." <u>Id.</u>; <u>see also</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993).

Petitioner does not assert nor does it appear in the record that the jury saw the belly chain worn by Petitioner during trial.  The following colloquy took place during the hearing regarding possibly restraining Petitioner during trial:

THE COURT:  And the request that you are making that he have a

20

> chain around his waist or belly and be chained to the chair can be effectuated so it is not visible to the jury.
> THE BAILIFF:  Yes.  Standing right here, you can't see it.  He can pull his shirt down around him.  There is a flap in the back of the chair so it doesn't look any different than a regular chair, no chains visible, no chains on his feet so they wouldn't be visible.  [¶]  So long as he doesn't pull his shirt up and actively show anybody, it wouldn't be visible at all.

(Reporter's Tr. at p. 140.)  Further, the use of the belly chain was justified for similar reasons as discussed regarding the use of the stun belt.  There is no evidence that the use of the belly chain prevented Petitioner from effectively examining witnesses.  As Petitioner does not allege nor show that the jury observed the belly chain, nor does the record indicate that it prevented him from effectively examining witnesses, Petitioner is not entitled to relief on this argument.  He also failed to show that the use of the belly chain had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 623.  Thus, he is not entitled to federal habeas relief that the use of the belly chain at trial violated his constitutional rights as well.

## B.  Claim II

In Claim II, Petitioner argues that his constitutional rights were violated when he was denied the right of access to the prison law library leading up to trial.  The Court of Appeal set forth the relevant facts that giving rise to this claim and ultimately denied relief:

> On May 11, 2001, approximately six weeks before trial, the court granted defendant's request to represent himself and signed a standard order which provided defendant access to legal materials at the county jail.  The order included the following provision:  "Legal Research:  The defendant shall be authorized the use of legal research materials.  The Sheriff may in his discretion either allow the defendant the use of the law library for at least two hours per week or provide to the defendant legal research materials in his/her cell.  The defendant shall be limited to copies of five cases per week and five code section[s] per week in his his/her cell.  Upon submission by the defendant of a list of legal research material by 8:00 a.m. of a business day, the Sheriff will be obliged to obtain and deliver these materials to the defendant by 5:00 p.m. on the next business day."

On June 25, 2001, defendant complained that he had been denied access to the jail law library because they had no record of his "pro per status." The court confirmed defendant's status with the law librarian. Thereafter, on June 29, 2001, defendant sought continuation of the July 3, 2001, trial date, arguing that the denial of law library privileges violated his constitutional rights. The district attorney acknowledged there had been "a glitch in [the] paperwork," but pointed out that defendant waited several weeks to raise the issue. He noted the case had been pending for three years and maintained defendant received adequate help from numerous attorneys and investigators during that time. The court questioned defendant outside the presence of the district attorney and denied the motion for lack of substantial prejudice. Defendant raised the issue unsuccessfully in his motion for new trial.

On appeal, defendant argues that "[e]ven though [he] acted as his own counsel, he nevertheless continued to have a Sixth Amendment right 'to counsel,'" a right which included access to legal materials in the law library or in his cell. He says the "'counsel' who was prevented from providing adequate representation was [defendant] himself." Defendant acknowledges he had access to the law library "at some point in time," but insists he was prejudiced by denial of access for the six weeks immediately before trial began. He maintains the lack of access prevented him from filing certain discovery motions, resulted in his making an untimely request for a ruling on a "critical suppression motion," and "may also have" prevented him from preparing arguments for and against certain jury instructions.

We consider and reject each of defendant's claims of prejudice in turn. First, defendant told the court he wanted to file a discovery motion to obtain fingerprint analysis and officer reports the district attorney said did not exist. These items were encompassed by the discovery motion granted by the court in January 1999. In addition, defendant told the court he wanted tests performed on Husted's vest and the gun found at the scene of the assault. Defendant also wanted to take pictures of Officer Husted's shoulder. In June 1999, while representing himself, defendant successfully moved for production and independent defense testing of physical evidence, including the vest and gun. Apart from the fact the court had previously granted similar discovery requests, this record suggests defendant was well aware of the legal grounds for discovery. Thus, he fails to show how lack of access to the library for the six weeks immediately before trial prevented him from filing discovery motions that should have been resolved earlier in the proceedings.

Next, on the second day of trial, defendant represented that he had previously filed a motion to suppress which was withdrawn without consent by former defense counsel Higgins. The court appointed Higgins to represent defendant on December 12, 2000,

1   and relieved him when it granted defendant's <u>Faretta</u> [v. California,
2   422 U.S. 806 (1975)] motion on May 11, 2001. Defendant does
    not specify the date he had filed the suppression motion. In ruling
3   that defendant's motion was untimely, the court explained it was
    his "responsibility as [his] own representative to make sure that
4   those issues [were] raised before trial." In any event, denial of
    access to the law library after May 11, 2001, cannot have had any
5   effect on defendant's ability to have the earlier suppression motion
    heard in a timely fashion.

6   Finally, defendant does not say lack of access to the law library
    did, in fact, prevent him from addressing legal issues relating to the
7   jury instructions. On the ninth day of trial, defendant complained
    that he was unable to review the proposed instructions in the jail
8   law library because it was closed when he returned from the
    courthouse. Before discussing jury instructions, the court provided
9   defendant with a book containing the form criminal instructions,
    along with the prosecution's proposed instructions, for review in
10  the holding tank during the lunch recess. There is no indication the
    procedure proposed by the court was inadequate.

11

12  (Slip Op. at p. 10-14 (footnote omitted).)

13      The United States Supreme Court has held that the denial of access to a law library

14  cannot provide the basis for federal habeas corpus relief because no Supreme Court case clearly

15  establishes a *pro se* petitioner's constitutional right to law library access. <u>See</u> <u>Kane v. Garcia</u>

16  <u>Espitia</u>, 546 U.S. 9, 10 (2005) (per curiam); <u>see</u> <u>also</u> <u>Mendoza v. Carey</u>, 449 F.3d 1065, 1070-71

17  (9th Cir. 2006) (explaining that <u>Kane</u> "held that the denial of access to a law library cannot

18  provide a basis for a *pro se* petitioner's habeas relief because no Supreme Court case clearly

19  establishes a *pro se* petitioner's constitutional right to law library access"). Therefore, in this

20  case, the state court decision denying this claim was not contrary to or an unreasonable

21  application of clearly established federal law to warrant federal habeas relief.

22      C. Claim III

23      In Claim III, Petitioner argues that his constitutional rights were violated when the trial

24  court denied his motion for a live pre-trial lineup. The California Court of Appeal discussed the

25  facts underlying this Claim in Petitioner's direct appeal:

26          Defendant argues he is entitled to reversal of his robbery

23

1   convictions because the court erred in denying his March 1999
2   motion for a live lineup.  The attorney declaration that
    accompanied the motion merely stated that the eyewitnesses to the
3   robbery at Day's Market did not have sufficient opportunity to
    observe the suspect because the robber wore a mask.  It also cited
4   inconsistencies in descriptions of the robber and a question
    whether the clerk identified defendant in the field show-up.
5   Counsel noted at the hearing that defendant was wounded and
    lying on the ground when the clerk arrived to view him.  The court
6   found there were no facts showing a substantial or reasonable
    likelihood of misidentification, and denied the motion.  On appeal,
7   defendant argues the *trial record* demonstrates that eyewitness
    identification was a material issue and there was a reasonable
    likelihood of mistaken identification in the field show-up.

8

9   (Slip Op. at p. 14-15.)

10          In Evans v. Superior Court, 11 Cal. 3d 617, 625, 114 Cal. Rptr. 121, 522 P.2d 681

11   (1974), the California Supreme Court held that "due process requires in an appropriate case that

12   an accused, upon timely request thereof, be afforded a pretrial lineup in which witnesses to the

13   alleged criminal conduct criminal conduct can participate."  Unlike Evans, the United States

14   Supreme Court has never held that a criminal defendant has a constitutional right to a pretrial

15   lineup.  The Ninth Circuit has explicitly rejected any constitutional dimension to a defendant's

16   request for a pretrial lineup.  See United States v. Robertson, 606 F.2d 853, 857 (9th Cir. 1979)

17   ("An accused has no absolute or constitutional right to a lineup."); see also Allen v. Smelosky,

18   Civ. No. 08-1782, 2010 WL 4366108, at *11 (C.D. Cal. May 17, 2010), report and

19   recommendation adopted by, 2010 WL 4363476 (C.D. Cal. Oct. 26, 2010); Sanders v. Director

20   of CDC, Civ. No. 05-2250, 2009 WL 2136935, at *9 (E.D. Cal. July 15, 2009) ("There is no

21   constitutional right to a lineup."); Johnson v. Giurbino, Civ No. 03-6013, 2007 WL 2481789, at

22   *20 (E.D. Cal. Aug. 29, 2007), report and recommendation adopted by, 2007 WL 2793309 (E.D.

23   Cal. Sep. 26, 2007).  For the foregoing reasons, Petitioner is not entitled to federal habeas relief

24   on Claim III.

25          D.  Claim IV

26          In Claim IV, Petitioner argues that the trial court committed reversible error when it

24

refused Petitioner from impeaching a prosecution witness with a prior misdemeanor conviction.

The California Court of Appeal discussed the facts underlying this claim in its decision on direct

appeal:

> At trial, Joseph Rojas described the struggle between Officer Husted and defendant.  Among other things, he said defendant shot first.  The court granted the prosecution's motion to exclude any reference to Rojas's prior misdemeanor convictions for vandalism and burglary on grounds they were "not sufficiently probative to be admitted for the issue of credibility . . . ."  Defendant argues he was entitled to impeach Rojas with the prior burglary conviction because it was a crime of moral turpitude.  He maintains the error deprived him of his Sixth and Fourteenth Amendment rights to confront witnesses and present a complete defense.

(Slip Op. at p. 16.)  At trial, the court concluded the following:

> My view is this:  A misdemeanor or a misdemeanor conduct is viewed in the law, understandably, as less probative, less impact, if you will, than a felony conviction for obvious reasons.  When the conduct constitutes moral turpitude, it can be relative; but under the circumstances of this case, where there has been almost 18, maybe more than 18 years since the conduct itself, no indications of any untoward contact with law enforcement, the indication is that he is a very productive member of society at this point and has been for some time.
> There are no specifics regarding the particulars of the case that make that – the value of that prior conviction to be particularly meaningful.
> I agree with the People's argument, that it is not sufficiently probative to be admitted for the issue of credibility in this case.  It is a preliminary matter under 352.

(Reporter's Tr. at p. 86.)  On direct appeal, the Court of Appeal affirmed this ruling and stated:

> The prosecution represented that Rojas's prior misdemeanor conviction for burglary occurred 18 or 19 years before trial, when he was 19 years old.  Rojas had no criminal history since that time and was currently employed by the state.  The prosecution argued the prior had no probative value for purposes of impeachment and "would be simply to embarrass the witness."  The court acknowledged that a misdemeanor is less probative than a felony conviction, cited the date of the prior and noted there were no details to show that the prior was particularly meaningful for purposes of impeachment.  We conclude there was no abuse of discretion on this record.

(Slip Op. at p. 17-18.)

1      Criminal defendants have a constitutional right to present relevant evidence in their own

2 defense.  See Crane v. Kentucky, 476 U.S. 683, 690 (1986).  The right comes from both the right

3 to due process under the Fourteenth Amendment, see Chambers v. Mississippi, 410 U.S. 284,

4 294 (1973), and the right "to have compulsory process for obtaining witnesses in his favor"

5 provided by the Sixth Amendment.  See Washington v. Texas, 388 U.S. 14, 23 (1967).  The

6 Confrontation Clause of the Sixth Amendment does not prevent a trial judge from imposing

7 reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of

8 issues, witness safety or interrogation that is repetitive or only marginally relevant.  See Delaware

9 v. Van Arsdall, 475 U.S. 673, 679 (1986).  The Confrontation Clause guarantees an opportunity

10 for effective cross examination, not cross examination that is effective in whatever way, and to

11 whatever extent the defense might wish.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per

12 curiam).  A petitioner meets his burden of showing a Confrontation Clause violation by showing

13 that "[a] reasonable jury might have received a significantly different impression of [a witness']

14 credibility . . . had counsel been permitted to pursue his proposed line of cross-examination."

15 Van Arsdall, 475 U.S. at 680.  In determining whether a criminal's right to confrontation has

16 been violated by the exclusion of evidence on cross-examination, a court must inquire

17 whether:  "(1) the evidence was relevant; (2) there were other legitimate interests outweighing

18 the defendant's interest in presenting the evidence; and (3) the exclusion of evidence left the jury

19 with sufficient information to assess the credibility of the witness."  United States v. Beardslee,

20 197 F.3d 378, 383 (9th Cir. 1999).

21      Rojas appeared at trial and was extensively cross-examined by Petitioner.  Petitioner

22 attempted to attack Rojas' credibility with his prior statements.  Even if the evidence of Rojas's

23 misdemeanor conviction was relevant, there were other legitimate interests outweighing

24 Petitioner's interests in presenting the evidence of the conviction as noted by the California Court

25 of Appeal and the jury had sufficient information to assess the credibility of Rojas.  Thus, under

26 these circumstances, the fact that the trial court excluded evidence of Rojas' prior misdemeanor

1    conviction did not violate Petitioner's Confrontation Clause rights.

2         Furthermore, even assuming *arguendo* that the trial court erred in not allowing Petitioner

3    to impeach Rojas with his prior misdemeanor conviction, the error was harmless.  The improper

4    denial of a defendant's opportunity to impeach a witness is subject to harmless-error analysis.

5    See Van Arsdall, 475 U.S. at 684 (stating that Confrontation Clause errors are subject to

6    Chapman v. California, 386 U.S. 18 (1967) analysis).  Petitioner is not entitled to federal habeas

7    relief unless he can establish that the trial court's error "had substantial and injurious effect or

8    influence in determining the jury's verdict." Brecht, 507 U.S. at 637; see also Forn v. Hornung,

9    343 F.3d 990, 999 (9th Cir. 2003) (finding that Confrontation Clause error did not have a

10   "substantial and injurious" effect on the verdict and that the error was therefore harmless).

11   Determining whether the error was harmless depends on a host of factors which include:  (1) the

12   importance of the witness' testimony in the prosecution case; (2) whether the testimony was

13   cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony

14   of the witness on material points; (4) the extent of cross-examination otherwise permitted; and

15   (5) the overall strength of the prosecution's case.  See Van Arsdall, 475 U.S. at 684.

16        In this case, Rojas' testimony concerning the shooting was corroborated by Husted.

17   Petitioner was able to fully cross-examine Rojas on what he observed on the date of the incident.

18   Any purported error in failing to allow Petitioner to impeach Rojas with an eighteen year old

19   misdemeanor conviction would be considered harmless under these circumstances.  Therefore,

20   Petitioner is not entitled to habeas relief on Claim IV.

21        E.  Claim V

22        In Claim V, Petitioner makes several arguments; specifically he argues that:  (1) the

23   prosecutor failed to meet his burden of proof regarding his conviction for being an ex-felon in

24   possession of a firearm because it did not satisfy the prior felony element of that charge; (2) the

25   1992 conviction of battery with serious bodily injury did not constitute a strike for sentencing

26   purposes because it was not a serious prior felony; (3) a jury rather than the trial judge should

have determined that the 1992 battery conviction was a serious prior felony for purposes of constituting a strike; and (4) using the 1992 battery conviction as a strike for sentencing purposes violated the 1992 plea agreement.  It does not appear that Petitioner raised these issues to the California Supreme Court.

A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must exhaust state judicial remedies.  See 28 U.S.C. § 2254(b)(1).  The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations.  See Coleman 501 U.S. at 731.  A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court.  See Duncan, 513 U.S. at 365; Picard, 404 U.S. at 276.  A federal court will find that the highest state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis.  See Duncan, 513 U.S. at 365.

Even though Petitioner's arguments as enunciated in Claim V are unexhausted because the factual and legal basis giving rise to the claims were not argued to the California Supreme Court, unexhausted claims may "be denied on the merits, notwithstanding the failure of the applicant to exhaust remedies in the courts of the State."  28 U.S.C. § 2254(b)(2).  A federal court considering a habeas corpus petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable."  See Cassett 406 F.3d at 624.

In his first argument within Claim V, Petitioner argues that there was insufficient evidence to convict him of being an ex-felon in possession of a firearm because there was insufficient evidence of his prior conviction at trial.  (See Pet'r's Traverse at p. 47 ("The People did not meet their burden of proving Petitioner's [prior conviction] of [Cal. Penal Code §] 243(d) satisfied the "prior felony" element prerequisite to a conviction of Count (5) (ex-felon in possession)") (internal quotation marks omitted).)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction, if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d at 982 (quoting Jackson, 443 U.S. at 318).  A petitioner for a federal writ of habeas corpus "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. V. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

The amended information charged Petitioner with violating Section 12021(a)[6] of the Penal Code and stated as follows:

> That on the 1st day of July, 1998, at and in the County of Sacramento, State of California, the defendant then and there before the filing of this information, did willfully and unlawfully own, possess and have custody and control of a firearm, to wit, a .22 caliber revolver, the said defendant having theretofore been duly and legally convicted of a felony, to wit, the crime of battery with serious bodily injury, in violation of Section 243(d) of the Penal Code, on or about the 29th day of June, 1992, by and before the Consolidated Superior and Municipal Court of the State of California for the County of Sacramento.

(Clerk's Tr. at p. 146.)  In this case, the prosecution presented evidence in the form of judicial documents (including his plea) that were admitted into evidence regarding Petitioner's 1992 §

---

[6] California Penal Code § 12021(a)(1) states:

> Any person who has been convicted of a felony under the laws of the United States, the State of California, or any other state, government, or country . . . who owns, purchases, receives, or has in his or her possession or under his or her custody or control any firearm is guilty of a felony.

1    243(d) conviction.  (See Reporter's Tr. at 1115 and Clerk's Tr. at 906.)  Viewing the evidence in

2    the light most favorable to the prosecution, there was sufficient evidence in the record such that

3    any rational trier of fact could have found that Petitioner was a convicted ex-felon so as to satisfy

4    that element to support the conviction for being an ex-felon in possession of a firearm.  Petitioner

5    is not entitled to federal habeas relief on this argument.

6        Next, Petitioner argues that there was insufficient evidence for the trial judge to

7    determine that the 1992 battery conviction constituted a serious prior felony for purposes of

8    California's Three Strikes Law.  To qualify as a strike under the Three Strikes Law, a prior

9    conviction must be either a "serious" or a "violent" felony.  See Cal. Penal Code § 667(d)(1).  A

10    serious felony is defined (amongst other definitions) as "any felony in which the defendant

11    personally inflicts great bodily injury on any person, other than an accomplice."  Id. §

12    2292.7(c)(8).  In this case, there was sufficient evidence in determining that Petitioner's 1992

13    conviction for battery with great bodily injury constituted a serious prior felony for purposes of

14    constituting a strike.  In California, the term "serious bodily injury" contained in California Penal

15    Code § 243(d) "is essentially equivalent to or synonymous with 'great bodily injury' for the

16    purpose of a 'serious felony' sentence enhancement pursuant to Penal Code sections 667,

17    subdivisions (a) and (d), and 1192.8, subdivision (c)(8)."  People v. Moore, 10 Cal. App. 4th

18    1868, 1871, 13 Cal. Rptr. 2d 713 (1992).  Thus, Petitioner's offense of battery with serious

19    bodily injury fell "under the statute's general category of 'any other felony in which the

20    defendant personally inflicts great bodily injury on any person, other than an accomplice.'"  Id.

21    Therefore, Petitioner is not entitled to federal habeas relief on this argument.

22        Next, Petitioner argues that the issue of whether his 1992 battery conviction constituted a

23    strike for sentencing purposes should have been determined by a jury rather than the trial judge.

24    (See Pet'r's Traverse at p. 51.)  In support of this argument, Petitioner relies on Apprendi v. New

25    Jersey, 530 U.S. 466 (2000).  At the outset, it is worth noting that the jury specifically found that

26    Petitioner was previously "convicted of a felony namely battery with serious bodily injury in

1   violation of Penal Code Section 243(d)."  (Clerk's Tr. at p. 818.)

2         Additionally, contrary to Petitioner's reliance on Apprendi, there is no federal

3   constitutional right to a jury trial on the fact that a prior conviction might increase a sentence.

4   See Apprendi, 530 U.S. at 489 ("*Other than the fact of a prior conviction*, any fact that increases

5   the penalty for a crime beyond the prescribed statutory maximum must be submitted to the

6   jury.") (emphasis added); see also Cunningham v. California, 549 U.S. 270, 282 (2007) ("Other

7   than a prior conviction, see Almendarez-Torres v. United States, 523 U.S. 224, 239-247, 118

8   S.Ct. 1219, 140 L.Ed.2d 350 (1998), we held in Apprendi, 'any fact that increases the penalty

9   beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a

10  reasonable doubt."); People v. McGee, 38 Cal. 4th 682, 685-86, 42 Cal. Rptr. 3d 899, 133 P.3d

11  1054 (2006) (finding no right to a jury trial to determine whether a prior conviction qualifies as a

12  strike "[u]nless and until the high court directs otherwise").

13        Finally, Petitioner asserts that using a 1992 conviction as a strike in determining his

14  sentence violated the 1992 plea agreement on that conviction.  The Sacramento County Superior

15  Court discussed the factual circumstances of this argument in analyzing one of Petitioner's state

16  habeas petitions:

17          Petitioner next claims that the use of his prior conviction from
            Case No. CR 111662 in Case No. 98F05829 violated his plea
18          agreement in Case No. CR 111662, and that no mention was made
            at the time that the conviction could be used in future prosecutions,
19          and that counsel was ineffective in failing to advise him of those
            consequences.
20
            Petitioner is correct, that no mention was made at the change of
21          plea hearing in Case No. CR 111662, as is borne out by the
            reporter's transcript for that hearing that is contained in the court's
22          underlying file for the matter.  However, that does not entitle him
            to relief.  The use of a prior conviction in a future prosecution for
23          enhancement purposes is a collateral matter that need not be
            disclosed by the court to a defendant when entering a guilty or no
24          contest plea (People v. Gurule (2002) 28 Cal.4th 557, People v.
            Crosby (1992) 3 Cal.App.4th 1352), nor may a defendant attack a
25          plea on the ground that his counsel failed to advise him of that
            collateral consequence (United States v. Fry (9th Cir. 2003) 332
26          F.3d 1198).  Rather, only if petitioner had been affirmatively

31

1    promised as part of the plea itself, that the conviction could not be
     sued in the future to enchance a sentence imposed on a future
2    crime (see generally Davis v. Woodford (9th Cir. 2006) 446 F.3d
     957; Buckley v. Terhune (9th Cir. 2006) 441 F.3d 688; Brown v.
3    Poole (9th Cir. 2003) 337 F.3d 1155; In re Honesto (2005) 130
     Cal.App.4th 81; People v. McElwee (2005) 128 Cal.App.4th 1348)
4    or if counsel had misadvised him on the matter (In re Moser (1993)
     6 Cal.4th 243), would he appear to be able to set forth an argument
5    that might possibly have merit.

6    (Resp'ts' Lodged Doc. 12 at p. 3.)

7        A criminal defendant's right to due process entitles him to enforce the terms of a plea

8    agreement.  See Santobello v. New York, 404 U.S. 257, 261-62 (1971).  "Plea agreements are

9    contractual in nature and are measured by contract law standards."  United States v. De La

10   Fuente, 8 F.3d 1333, 1337 (9th Cir. 1993).  As the Ninth Circuit has explained:

11       In California, "[a] negotiated plea agreement is a form of contract,
         and is interpreted according to general contract principles," People
12       v Shelton, 37 Cal. 4th 759, 37 Cal. Rptr. 3d 354, 125 P.3d 290
         (2006) and "according to the same rules as other contracts," People
13       v. Toscano, 124 Cal. App.4th 340, 344, 20 Cal. Rptr. 3d 923
         (2004) (cited with approval in Shelton along with other California
14       cases to same effect dating back to 1982).  Thus . . . California
         Courts are required to construe and interpret plea agreements in
15       accordance with state contract law.

16   Buckley v. Terhune, 441 F.3d 688, 695 (9th Cir. 2006).  Under California law, a plea bargain is

17   "deemed to incorporate and contemplate not only the existing law but the reserve power of the

18   state to amend the law or enact additional laws for the public good and in pursuance of public

19   policy."  People v. Gipson, 117 Cal. App. 4th 1065, 1070, 12 Cal. Rptr. 3d 478 (2004) (citation

20   omitted).  Absent an express promise that convictions resulting from a petitioner's plea

21   agreement would not be used to enhance Petitioner's sentence for future convictions in a way

22   other than proscribed by the then existing version of California's Penal Code, the plea agreement

23   vested no rights other than those which related to the immediate disposition of the case.  See id.

24       In this case, Petitioner fails to show that his plea agreement had such a promise.  The plea

25   colloquy for the 1992 conviction states that beyond those promises mentioned in open court,

26   Petitioner was not promised anything else which caused him to enter his plea.  (See Resp'ts'

Lodged Doc. 11 at p. 59.)  He has not shown that he was promised anything with regard to the

fact that the 1992 battery conviction would only be used to enhance future sentences in

accordance with the then-existing sentencing regime.  Thus, Petitioner is not entitled to federal

habeas relief on any of his arguments within Claim V.

## VI.  PETITIONER'S REQUESTS

### A.  Request for an Evidentiary Hearing

Petitioner requests an evidentiary hearing on his Claims.  (See Pet'r's Pet. at p. 37.)

Pursuant to 28 U.S.C. § 2254(e)(2), a district court presented with a request for an evidentiary

hearing must first determine whether a factual basis exists in the record to support a petitioner's

claims and, if not, whether a factual basis exists in the record to support a petitioner's claims and,

if not, whether an evidentiary hearing "might be appropriate."  Baja v. Ducharme, 187 F.3d 1075,

1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir. 2005).  A

petitioner requesting an evidentiary hearing must also demonstrate that he has presented a

"colorable claim for relief."  Earp, 431 F.3d at 1167 (citations omitted).  To show that a claim is

"colorable," a petitioner is "required to allege specific facts which, if true, would entitled him to

relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation

omitted).  In this case, an evidentiary hearing is not warranted for the reasons stated in supra Part

V.  Petitioner failed to demonstrate that he has a colorable claim for federal habeas relief.

### B.  Request for Discovery

Petitioner also has filed a motion for discovery.  (See Dkt. No. 49.)  In the motion,

Petitioner seeks "one true original copy of latent print request form dated: 2-2-01 Log # 50460

(case report # 98-50733)."  Petitioner asserts that this request relates to the rights associated with

representing himself at trial.

Parties to a habeas proceeding are not entitled to discovery as a matter of course.  See

Bracy v. Gramley, 520 U.S. 899, 904 (1997).  Rather, "[a] judge may, for good cause, authorize a

party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of

1  discovery." Rule 6(a), Rules Governing § 2254 Cases; see also Bracy, 520 U.S. at 904.  Good

2  cause is shown "where specific allegations before the court show reason to believe that the

3  petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to

4  relief." Id. at 908-09 (internal quotation marks and citation omitted); see also Pham v. Terhune,

5  400 F.3d 740, 743 (9th Cir. 2004).  In this case, Petitioner has failed to show good cause to

6  warrant his request for discovery as he has not shown reason to believe that he would be entitled

7  to relief if facts are more fully developed.

8                                 VII.  CONCLUSION

9        For the reasons discussed in this Order, Petitioner is not entitled to federal habeas relief.

10 Should petitioner wish to appeal to appeal the court's decision, a certificate of appealability must

11 issue.  28 U.S.C. § 2253(c)(1); Hayward v. Marshall, 603 F.3d 546, 554 (9th Cir. 2010) (en

12 banc).  A certificate of appealability may issue where "the applicant has made a substantial

13 showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate of

14 appealability must "indicate which specific issue or issues satisfy" the requirement.  28 U.S.C.

15 § 2253(c)(3).

16       A certificate of appealability should be granted for any issue that petitioner can

17 demonstrate is "'debatable among jurists of reason,'" could be resolved differently by a different

18 court, or is "'adequate to deserve encouragement to proceed further.'"  Jennings v. Woodford,

19 290 F.3d 1006, 1010 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).[7]  In

20 this case, however, petitioner failed to make a substantial showing of the denial of a

21 constitutional right with respect to any issue presented.

22 //

23 //

24

25       [7] Except for the requirement that appealable issues be specifically identified, the standard
for issuance of a certificate of appealability is the same as the standard that applied to issuance of
26 a certificate of probable cause.  See Jennings, 290 F.3d at 1010.

                                        34

Accordingly, IT IS HEREBY ORDERED that:

1.      Petitioner's request for an evidentiary hearing is DENIED;

2.      Petitioner's motion for production of documents (Dkt. No. 49) is DENIED;

3.      Petitioner's Petition for writ of habeas corpus is DENIED;

4.      A certificate of appealability shall not issue; and

5.      The Clerk is directed to close this case.

DATED:  January 26, 2011

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE